## In re PEACOCK.

(Circuit Court, E. D. North Carolina. March 8, 1910.)

### No. 294.

**1.** BANKRUPTCY (§ 151*)—ADMINISTRATION OF ESTATE—TITLE OF TRUSTEE.

On an adjudication of bankruptcy, all property of the bankrupt, wherever situate and in whosesoever possession, passes into the custody of the court, and on the appointment of a trustee vests in him, but in the same condition and subject to the same equities as in the hands of the bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 151.*]

**2.** BANKRUPTCY (§ 224*)—ADMINISTRATION OF ESTATE—POWERS OF REFEREE.

A referee in bankruptcy has no jurisdiction to order third persons, in possession of property claimed by the trustee, to deliver it to the trustee, where the possession of the third persons is based on a bona fide adverse claim.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 224.*]

**3.** BANKRUPTCY (§ 224*)—ADMINISTRATION OF ESTATE—POWERS OF REFEREE.

The possession of cotton by a pledgee to secure advances made to the pledgor is based on such a bona fide adverse claim as bars the right of the referee in bankruptcy of the pledgor to order the delivery of the cotton to the trustee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 224.*]

**4.** BANKRUPTCY (§ 342*)—ADMINISTRATION OF ESTATE—POWER OF REFEREE.

On an application to a referee to expunge a creditor's proof of claim, the referee has no power to do more than allow the petition, expunge or diminish the claim, or refuse to do either, and cannot render any affirmative judgment against the creditor.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 342.*]

**5.** PLEDGES (§ 11*)—WHAT CONSTITUTES PLEDGE.

Whether an executory contract to ship cotton as security for advances to the shipper could have been specifically enforced or not, when the contract was executed by the shipment, the consignee held the cotton in pledge for the purpose of selling and paying the debt.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 28–35; Dec. Dig. § 11.*]

**6.** BANKRUPTCY (§ 188*)—TITLE OF TRUSTEE—PROPERTY PLEDGED.

The rights of a pledgee in respect to his lien are not affected by the adjudication of bankruptcy of the pledgor or the appointment of his trustee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 188.*]

**7.** PLEDGES (§ 56*)—ENFORCEMENT OF LIEN—SALE OF PROPERTY.

A pledgee may upon default sell the property, the power being implied from the transaction itself.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. § 152; Dec. Dig. § 56.*]

**8.** BANKRUPTCY (§ 214*)—ADMINISTRATION OF ESTATE—RIGHTS OF CREDITORS—SALE OF PLEDGED PROPERTY.

Under Bankr. Act July 1, 1898, c. 541, § 57, 30 Stat. 560 (U. S. Comp. St. 1901, p. 3443), providing that the value of securities held by a creditor shall be determined by converting them into money according to the agreement by which the securities were held, even if a pledgee of the bankrupt had agreed to sell only at the direction of the pledgor, he had the right, as against the trustee in bankruptcy of the pledgor, to sell the property and apply the proceeds to the debt after the adjudication of bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 214.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

9. PLEDGES (§ 56*)—ENFORCEMENT OF LIEN—DUTY OF PLEDGOR.
A pledgee's power to sell must be exercised with due regard to the interests of the pledgor, and the pledgee in making a sale will be regarded as a trustee, and the sale must be conducted fairly, and in such a way as to subserve the interests of all concerned.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 152–183; Dec. Dig. § 56.*]

10. BANKRUPTCY (§ 279*)—ACTIONS BY TRUSTEE—RIGHT OF ACTION.
The holding that the right of a pledgee of a bankrupt to prove his claim against the estate was not forfeited by his sale of the property pledged and application of the proceeds to his claim does not affect the trustee's right to a plenary suit against the pledgee for an accounting, and if the sale was in any respect improvident the pledgee will be held liable for such amount as the court may find was lost by reason thereof.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 279.*]

11. BANKRUPTCY (§ 342*)—ADMINISTRATION OF ESTATE—PROCEEDINGS BEFORE REFEREE.
On an application before a referee in bankruptcy to expunge a creditor's proof of claim and for other relief, where the creditor as pledgee of the bankrupt had sold cotton consigned to him by the bankrupt and there was no evidence of negligence or improper handling or storage of the cotton by the creditor, the weights of the cotton sold as shown by the licensed weigher should be adopted as against those of the bankrupt; their correctness remaining open to attack in a plenary suit by the trustee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 342.*]

12. BANKRUPTCY (§ 342*)—ADMINISTRATION IN OTHER STATE—PROCEEDINGS BEFORE REFEREE—EVIDENCE.
On an application before a referee to expunge a creditor's proof of claim, evidence *held* insufficient to show, for the purposes of such application, that the bales of cotton sold by the creditor were other than those consigned to him by the bankrupt as security for advances.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 342.*]

13. BANKRUPTCY (§ 166*)—PREFERENCES—WHAT CONSTITUTES PREFERENCE.
Where a creditor, in pursuance of a long-continued course of business, receives shipments of cotton and makes advances to the consignor within four months preceding the adjudication of the bankruptcy of the consignor, neither of them knowing at the time that the consignor was insolvent, the excess of the shipment received over the amount of the advancements does not constitute a voidable preference, defined by Bankr. Act July 1, 1898, c. 541, §§ 60, 67e, 30 Stat. 562, 564 (U. S. Comp. St. 1901, pp. 3445, 3449).

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 166.*]

14. BANKRUPTCY (§ 342*)—PREFERENCES—EVIDENCE.
On an application before a referee to expunge a creditor's proof of claim, evidence *held* not to show that the creditor had reasonable cause to believe that shipments of cotton to him within four months preceding adjudication of bankruptcy were intended to give him a preference.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 342.*]

15. BANKRUPTCY (§ 311*)—PREFERENCES—RIGHT TO AVOID.
It is only when a transaction comes within Bankr. Act July 1, 1898, c. 541, § 60, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), or section 67e, defining voidable preferences, that section 57g, providing that the claims of creditors who have received preferences shall not be allowed unless such creditors shall surrender their preferences, applies.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 311.*]

In the matter of the bankruptcy of R. E. Peacock. From an order of the referee on a petition to expunge proof of debt and for other re-

lief, an appeal is taken. Reversed, and cause remanded to the referee for further proceedings.

W. C. Munroe, A. C. Davis, and Robt. G. Grady, for trustee.
Jacob Battle, for creditor.

CONNOR, District Judge. The material facts are: On April 20, 1909, upon petition of certain of his creditors, R. E. Peacock was adjudged an involuntary bankrupt, and after proper proceeding had E. C. Cobb appointed and qualified as his trustee. On May 5, 1909, John N. Vaughan, of Norfolk, Va., trading under the firm name and style of Vaughan & Barnes, filed with the referee proof of debt against the estate of the bankrupt. On May 17, 1909, the trustee filed a petition with the referee to expunge the proof of debt and for other relief.

The grounds of the petition are fully set out and may be summarized as follows: That the creditor had received preferences within the four months next immediately preceding the date of filing the petition, and has not surrendered the preferences so received. The trustee sets out in detail the basis of his contention, both for having the proof of debt expunged and the further relief demanded. He prays: (1) That the proof of debt be expunged from the list of claims proved, etc. (2) "That Vaughan & Barnes be required to surrender to him the proceeds of certain cotton held in trust for the bankrupt, together with any sum that may have been lost by an unauthorized sale thereof." (3) "That Vaughan & Barnes be required to pay to him the proceeds of the cotton shipped to them within the four months next preceding the filing of the petition, in excess of advances during that period," etc. (4) "For other and further relief," etc.

The trustee, with permission of the referee, amended his petition by alleging, in addition to the matters set out:

"That Vaughan & Barnes had not sold the 679 bales of cotton which was in their hands at the time of the bankruptcy, and that it was so mixed with other cotton as to be indistinguishable."

John N. Vaughan filed an answer to the petition, making a special appearance for that purpose, as follows:

"He appears specially and solely to object to the jurisdiction of the court to compel him to answer so much of said petition as is contained in prayers 2, 3, and 4, and not confessing," etc., "pleads to the jurisdiction of this court over him as to the said matters just hereinbefore mentioned, and says that this court has not, under the said petition, jurisdiction over this defendant, nor any right under the law to pass upon any of the matters mentioned in the second, third, and fourth prayers of the said petition, but for the purpose solely of sustaining the proof of claim," etc.

He thereupon proceeds to answer the allegations pertinent to the validity of his claim, etc. The petition and answer came on for hearing upon testimony and argument, when, after giving his view of the law and citing authorities to sustain him, the referee adjudges:

(1) "That this court has jurisdiction." (2) "That the proof of claim of Vaughan & Barnes be and the same is hereby expunged from the list of creditors." (3) "That Vaughan & Barnes pay over to E. C. Cobb, trustee in bankruptcy, the value of Peacock's cotton as of the date of filing his petition against them, to wit, May 17, 1909, computed on the basis of the weights

shown ᵼ Peacock's book and the prices computed on the basis of the official value middling cotton on the Norfolk and Portsmouth Cotton Exchange of the sᵉ ᵉ date, May 17, 1909, together with the cost of this action." (4) "That after ᵼaughan & Barnes have complied with article 3 of this ruling it is adjudge that they be allowed to file a new proof of their claim in this matter."

Vᵼ ᵼghan & Barnes duly filed a petition to the judge to review the concᵼᵼsions and rulings of the referee, assigning errors therein. The recoᵼ d was certified to the judge and heard upon argument of counsel.

Tᵼ e petition is filed pursuant to the provisions of section 57, subsec. "k" ᵼf the bankrupt act (Act July 1, 1898, c. 541, 30 Stat. 561 [U. S. Con ᵼ. St. 1901, p. 3444]), and section 6 of rule 21, General Orders in Banᵼ ruptcy (89 Fed. x, 32 C. C. A. xxiii), which provides that:

"ᵼ hen the trustee, or any creditor, shall desire the re-examination of any ᴄᵼaiᵼ filed against the bankrupt's estate, he may apply by petition to the referee, ᵼo whom the case is referred, for an order, for such re-examination and, therᵉ ᵼpon, the referee shall make an order fixing the term for hearing the petitioᵼ , of which due notice shall be given by mail addressed to the creditor. At t e time appointed, the referee shall take the examination of the creditor, and of any witnesses, that may be called by either party and if it shall appear by such examination that the claim ought to be expunged, or diminished, the referee may order accordingly."

Rule 27 (89 Fed. xi, 32 C. C. A. xxvii) provides that the creditor, or trustee, may by petition have the judge review any order made by the referee, etc.

In his rulings, the referee did not find any facts specifically, but proceeded upon the theory that the cotton in controversy, although in the possession of the creditor, in any point of view, passed by the adjudication into the custody of the court, and that the trustee was entitled to have it turned over to him before the questions in controversy were passed upon, or the creditor permitted to prove his debt for which he claimed the right to hold it as security. Having reached this conclusion, he postponed the decision of all questions raised by the petition and answer until the order in respect to the possession had been complied with. He finds that the cotton had been sold since the adjudication in bankruptcy, and that such sale was unauthorized, and charges the creditor with the value of it as of the date of the petition by the trustee. The creditor having, in due season and by proper plea, raised the question of the jurisdiction of the referee to render any affirmative judgment against him, or to do more than either expunge, diminish, or allow the claim proven, the question of jurisdiction is presented, and must be first disposed of.

The facts, appearing on the record and undisputed, material to the decision of this question, are as follows: Vaughan & Barnes, cotton factors and commission merchants, residing and doing business in Norfolk, Va., have for 18 years made advancements in money, accepting and paying his drafts, to R. E. Peacock, a merchant residing and doing business in Fremont, N. C. He sold goods and made advancements "on time" to farmers and their tenants, and bought in payment therefor and otherwise, cotton, which he shipped to said Vaughan & Barnes to be held by them and sold on commission, applying the proceeds to the payment of his indebtedness for money advanced. He also deposited with Vaughan & Barnes, as collateral security for such advancements, notes, mortgages, crop liens, etc., taken from his custom-

ers for advancements made to them. In regard to the terms upon and the purposes for which the cotton was shipped to and held by Vaughan & Barnes, Peacock says:

"I agreed to ship the cotton covered by crop liens, when the cotton was ready for shipment, to Vaughan & Barnes as security for advances made and for such other advances as might be made from time to time."

He further says that he regarded the cotton as being under lien to Vaughan & Barnes "for what he owed them." It appears that settlements were had for each year's transactions and balances brought forward. During the season of 1908–1909 a large quantity of cotton was shipped and drafts drawn and paid. On March 12, 1909, Peacock made an assignment, which was followed by the proceeding in bankruptcy. At that time Vaughan & Barnes had in their possession, stored in warehouse in Norfolk, 679 bales of cotton shipped by Peacock, who owed, approximately, $37,032.90. Vaughan & Barnes had collateral notes, mortgages, and crop liens of considerable amount, the estimated value of which was about $2,500, and a mortgage on real estate valued at $2,000. The cotton was sold April 28, 1909. for the net sum of $30,909.08, which was credited on account. This, together with the esti mated value of the collaterals, left a balance of $2,869.77, including interest to April 29, 1909, being the amount for which proof was filed.

The referee does not pass upon the correctness of the amount, but postpones its consideration until the proceeds of the cotton are paid to the trustee. His conclusion is based upon the proposition, maintained by the trustee, that immediately upon and by virtue of the adjudication all of the property of the bankrupt, wherever situate and in whosesoever possession it may be, passes into the custody of the court, and upon the appointment of the trustee vests in him. This is undoubtedly correct, and is fully sustained by the authorities cited by him and in the brief of counsel for the trustee. It is, however, subject to the limitation that such property so passes and vests "in the same plight and condition that the bankrupt himself held it and subject to all the equities impressed upon it in the hands of the bankrupt," or, as is sometimes said by the courts, the trustee, in respect to the property of the bankrupt, "simply stands in the shoes of the bankrupt and has no greater right than he has." York Manufacturing Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782; Bryant v. Swofford Bros., 214 U. S. 279, 29 Sup. Ct. 614, 53 L. Ed. 997. This may be regarded as elementary. Of course, if the bankrupt has made a fraudulent transfer of his property or a voidable preference, the trustee, by appropriate proceedings, may recover it, or its value, to be administered in accordance with the provisions of the act.

The question now under consideration, however, is not what the ultimate rights of the trustee may be, but the court in which and the method by which he may assert such rights and have them determined. It is the duty of the bankrupt to deliver into the possession of the trustee all such property as he may have, other than such as is exempt by law, and it is likewise the duty of any person who, as agent of the bankrupt or his mere bailee, has property in his possession, having no adverse claim thereto, to deliver it to the trustee. For failure to do so

the bankrupt, or his agent or bailee, may by a summary proceeding before the referee be ordered to deliver such property to the trustee, and for refusal be attached for contempt. The limitation upon the jurisdiction of the referee to order third persons, in possession of property claimed by the trustee, to deliver to him, is found when the possession is based upon a bona fide adverse claim to the property. For the purpose of ascertaining whether such claim exists, the referee may make inquiry; but when he finds its existence he must dismiss the petition, and leave the trustee to prosecute his claim, if so advised, in a court of competent jurisdiction.

In Mueller v. Nugent, 184 U. S. 1, 22 Sup. Ct. 269, 46 L. Ed. 405, it was held that, when the brother of the bankrupt had in his possession as agent a sum of money belonging to the bankrupt to which he made no adverse claim, the referee had jurisdiction in a summary proceeding to order him to pay it over to the trustee. The distinction between that case and one in which there exists a bona fide adverse claim to retain the property by the person in possession is pointed out by Mr. Justice Peckham in Jaquith v. Rowley, 188 U. S. 620, 23 Sup. Ct. 369, 47 L. Ed. 620. There a sum of money had been put in the possession of respondent by the bankrupt prior to his adjudication to indemnify him against loss by reason of being his surety on a bail bond. The learned justice said:

"The proceeding was a summary application to the court in bankruptcy to grant an order in a matter, the result of the granting of which would be to immediately take from the surety moneys which had been deposited with him before the commencement of the proceedings in bankruptcy, and thus compel him to come into the bankruptcy court for the litigation of questions as to his right to retain the money. * * * To extend such a jurisdiction over an adverse claimant would be within the prohibition of sections 23a and 23b, whether such jurisdiction were exerted by an action, strictly so called, or by a summary application to the court in bankruptcy. * * * It is the exercise of a jurisdiction which the section prohibits, and the particular method in the court is immaterial. The surety in whose hands the money was placed, to indemnify him for his liability on the bail bond was an adverse claimant within the meaning of the section of the act, and could not be proceeded against in the bankruptcy court unless by his consent as provided for therein. It is not necessary, in order to be an adverse claimant, that the surety should claim to be the absolute owner of the property in his possession. It is sufficient if, as in the present case, the money was deposited with him to indemnify him for his liability upon the bail bond, and that liability had not been determined and satisfied. If the trustee desires to test the question of the right of the surety to retain the money, he must do so in accordance with the provisions of the section of the bankrupt law referred to."

See In re Sunseri (D. C.) 156 Fed. 103; In re Horgan, 158 Fed. 774, 86 C. C. A. 130.

"A referee may not determine the ownership of property in possession of a claimant who asserts his claim in good faith in answer to the trustee's petition for a summary order that the property be turned over to him." In re Walsh Bros. (D. C.) 163 Fed. 352.

These decisions are in point and of controlling authority. In Re Scherber (D. C. Mass.) 131 Fed. 121, the question is discussed and the cases reviewed by Judge Lowell, reaching the conclusion that when property at the time of the adjudication is in the possession of some one other than the bankrupt, and when the claim to retain such pos-

session is not merely colorable, but adverse, and objection is duly made, the referee has no jurisdiction by summary proceeding to order its delivery to the trustee. The question of jurisdiction, as between the state courts, the District Court, and the Circuit Courts, is discussed in Bardes v. Bank, 178 U. S. 524, 20 Sup. Ct. 1000, 44 L. Ed. 1175, and the changes in the statute (Act 1903) pointed out in Collier on Bankruptcy (1909) 398–407.

These questions do not arise upon this record. The discussion, so far, has gone upon the theory that the referee was acting in a summary proceeding instituted by the trustee; whereas, the only way in which the matter came before him was by a petition to expunge the proof of debt. It was only for this purpose that the creditor was before the court. It is held, in accordance with the authorities and reason, that in such cases the referee has no power to do more than allow the petition, expunge or diminish the claim, or refuse to do either. He has no jurisdiction to render any affirmative judgment against the creditor. Fitch v. Richardson, 147 Fed. 197, 77 C. C. A. 423. To confer upon the referee the jurisdiction to pass upon and decide controversies regarding the title to property between the trustee and third parties, frequently and as in this case involving questions and issues of fact, would be to deprive the parties of trial by jury as secured by the Constitution. The mere fact that a person has been adjudged a bankrupt does not deprive other persons, owning or claiming purely legal rights to property claimed by the trustee, of having such rights adjudicated in the courts and by the procedure guaranteed to them by the Constitution. Eyster v. Gaff, 91 U. S. 521, 23 L. Ed. 403; Bardes v. Bank, supra.

Without pursuing the subject further, it is manifest that the referee had no jurisdiction to do more than pass upon the motion to expunge the proof of debt, and that in so far as he orders the payment to the trustee of the proceeds of the cotton in the possession of Vaughan & Barnes he was without power or jurisdiction. The referee dealt with the right of Vaughan & Barnes to apply the proceeds of the cotton to their debt, upon the theory that they were claiming a factor's lien. All of the testimony shows that the cotton was shipped them for the specific purpose of being sold and applying the proceeds to the amount due for advancements. Whether the executory contract made before the shipment, by which Peacock agreed in advance to ship the cotton, could have been specifically enforced against him, it is clear that, when it was executed by the shipment, Vaughan held the cotton in pledge for the purpose of selling and paying the debt. It would seem clear that Peacock could not have demanded possession or sued for the proceeds until he paid the debt. In addition to the contract to ship, much of the cotton was covered by mortgages and liens deposited with Vaughan. He was entitled to call upon Vaughan for an accounting in which the proceeds of the cotton would have been applied to the indebtedness and any balance found due paid over to him. The contract, as admitted by Peacock, pursuant to which the cotton was shipped, conforms to the common-law definition of a pledge which is said to be:

"A bailment of goods by his debtor to his creditor to be kept by him until his debt is discharged," or "a delivery to another of goods or chattels to be security to him for money borrowed of him by the bailor."

It is well settled that the rights of the pledgee, Vaughan & Barnes, in respect to the lien, were not affected by the adjudication of Peacock or the appointment of his trustee. Marshall v. Knox, 16 Wall. 551, 21 L. Ed. 481; Jerome v. McCarter, 94 U. S. 734, 24 L. Ed. 136; Yeatman v. Savings Inst., 95 U. S. 764, 24 L. Ed. 589. In the last case it is held:

"Until he shall be paid the pledgee is entitled to the possession of the property which he holds under a valid pledge, as security for his debt against the pledgor, notwithstanding a subsequent adjudication of bankruptcy against him; and his refusal to surrender it to the assignee is not a conversion of it." Eyster v. Gaff, 91 U. S. 524, 23 L. Ed. 403.

It is equally well settled that the pledgee may, upon default, sell the property. The power is implied from the transaction itself, and is the presumed intention of the parties. 22 Am. & Eng. Enc. 823; Feild v. Farrington, 10 Wall. 141, 19 L. Ed. 923. Of course, the right to sell, as to time, manner, and terms, is subject to the contract of the parties.

It is insisted that the cotton was not to be sold until Peacock directed. The evidence in regard to this averment is not very satisfactory. Peacock says that they were not to sell until he instructed; that they never sold until instructed. Vaughan denies that there was any such agreement. Without passing upon this conflict in the testimony, it would seem that after Peacock was adjudged a bankrupt he had no further control over the cotton; his right, if such he had, to direct the time of sale was personal; his interest passed to the trustee; the pledgee was remitted to his rights, regardless of any special agreement with Peacock. He certainly was not required to hold a large quantity of cotton for a bankrupt pledgor, where, as shown by the sales, it was not worth, within several thousand dollars, the indebtedness for which it was pledged.

Assuming that Vaughan & Barnes were free to sell the cotton in open market, did the adjudication in bankruptcy affect such right? The act (section 57) provides that the value of securities held by a creditor shall be determined by converting the same into money according to the terms of the agreement pursuant to which such securities were delivered to such creditor, or by such creditors, and the trustee, etc. The evidence shows that, on March 12, 1909, Peacock made a general assignment of his property to Cobb and Hooks. The former was the principal clerk and in the employment of Peacock, having full knowledge of the condition of the account between the parties. Cobb was appointed receiver April 20, 1909, and trustee May 5, 1909. There is evidence that the attorney for Vaughan & Barnes had a conference with the assignee, and that the question of selling the cotton was discussed, although there is some difference in the recollection of the parties as to what was said. Cobb says, however, that he did not make any objection to the sale, nor any demand for the cotton until the filing of the petition, May 17, 1909. The evidence shows that the cotton was sold in open market, and brought its full value on the market on the day of sale. The measure of duty imposed on the pledgee is that:

"The power of sale must be exercised with a due regard to the interest of the pledgor, as well as the pledgee. The pledgee, in making the sale, will be regarded as a trustee, and the sale must be conducted fairly and in such a way

as to subserve, not only the rights of the pledgee, but the interest of all concerned." 22 Am. & Eng. Enc. 886, 887.

It is a matter of common knowledge that cotton is sold in open market by sample, and not at public auction. It is also manifest that it was understood between the parties that the cotton was to be sold in the usual way. It is well known that the price of cotton is subject to constant fluctuation. A change of one-half cent in the price of 679 bales of cotton would have made a difference in its value of as much as $1,500. It is manifest that Vaughan had every possible motive to sell to the best advantage. It is but a reasonable interpretation of the contract of pledge that Vaughan & Barnes should sell the cotton whenever, in their judgment, the best interests of their pledgor and themselves demanded. To put any other construction upon it would be unreasonable, and would put it into the power of Peacock, or his trustee, to compel the pledgee creditor to speculate on the market at Vaughan's expense and risk.

Judge Story states the principle governing the conduct and describing the rights and duties of the pledgor:

"Where the consignment is made generally, without any specific orders as to the time or mode of sale, and the factor makes advances or incurs liability on the footing of such consignment, then the legal presumption is that the factor is intended to be clothed with the ordinary rights of factors to sell in the exercise of a sound discretion, at such time and in such mode as the usage of trade and his general duty require. * * * Of course, this right of the factor to sell, to reimburse himself for his advances and liabilities, applies with stronger force when the consignor is insolvent, and where, therefore, the consignment constitutes the only fund for the indemnity." Brown v. McGran, 14 Pet. 479, 496, 10 L. Ed. 550.

Conceding, therefore, that the title of the trustee relates back to the adjudication, such title was subject to Vaughan's right to sell the cotton and apply the proceeds to the debt. In re Mertens, 144 Fed. 818, 75 C. C. A. 548, Judge Wallace says:

"The present act provides that the value of his security may be determined, among other methods, by converting it into money pursuant to his contract rights, and thus, if he has enforced it as the contract with the debtor allowed, he is permitted to prove the unsatisfied balance of his claim. Section 57, subd. 'a,' prescribes several modes of valuation, and the one referred to is exclusive of the others, and is superfluous and useless, unless it is intended to authorize the creditor, without interference by the trustee or the court, to value his own security provided he turns it into money 'according to the terms of the contract pursuant to which it was delivered to him.'"

The questions involved in that case were before the court in Hiscock v. Varick Bank, 206 U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945. Mr. Chief Justice Fuller, after quoting section 57b, says:

"It is only when the securities have not been disposed of by the creditor in accordance with his contract that the court may direct what shall be done in the premises. Of course, where there is fraud, or proceeding contrary to the contract, the interposition of the court might be properly invoked. * * * When the petition in the present case was filed, the bank had a valid lien on these policies for the payment of its debt. The contracts under which they were pledged were valid and enforceable under the laws of New York, where the debt was incurred and the lien created. The bankruptcy act did not attempt by any of its provisions to deprive the lienor of any remedy which the law of the state vested in him."

It must be noted that the only question presented, upon this review, is whether Vaughan & Barnes have, by selling the cotton after the adjudication and before the appointment of the trustee, forfeited the right to prove for the balance due on the debt. In holding that the right to prove was not forfeited, the right of the trustee, in a plenary suit for an accounting, is not affected. If shown that the sale was, either in respect to time, place, manner, or price, improvident, or regardless of the rights of the trustee, he will be liable for such amount as the court may find was lost by reason thereof.

It is insisted that there is a shortage in weights of the cotton, and the referee was of the opinion that Vaughan was liable for the weights as shown by Peacock's book. The evidence shows that each bale was weighed by a "licensed weigher," and his certificate is filed, showing the weights on April 28, 1909, at the time and for the purpose of sale and delivery. While the numbers marked on the bales and weights do not correspond with the books of Peacock and the bills of lading, the number of bales is the same. The aggregate weights do not correspond. It is claimed by the trustee that the discrepancy is more than is usual. On the other hand, Vaughan & Barnes claim that the variation is about the same as is usually found in shipments of cotton under similar conditions. The referee does not pass upon the evidence, but adopts the weights as shown by Peacock's books. The pledgee is liable for the correct weight at the time of sale, and any shortage caused by negligence, or improper handling, or storage. There is no evidence of any default in these respects. After examining the evidence, I am of the opinion that, for the purpose of proving the claim, the weights as shown by the "licensed weigher" in Norfolk should be adopted. Their correctness will be open to attack in a plenary suit.

The trustee, by amendment to his petition, presents a very serious charge. He says that, an examination of the marks, number, and weights of the bales sold by Vaughan & Barnes on April 28, 1909, when compared with the marks, number, and weights shown by Peacock's cotton book and bills of lading, shows that the 679 bales of cotton sold is not the same cotton as that shipped; that while as to many bales there is a correspondence, as to a very large number there is an irreconcilable difference. I have examined the evidence of the employés and others, taken in Norfolk, who received, stored, had charge of, weighed out, and made a record of the weights, number, etc., and of the clerks, weigher, and waybills at Fremont. It is impracticable to enter into a critical examination of the alleged, and in some instances apparent, discrepancies. The testimony, which is uncontradicted, shows that the cotton was received in 57 lots, at different times during the fall of 1908 and in January and February of 1909; that the transportation company transferred it from Pinner's Point by barges to the dock in Norfolk. It was counted, receipted for, and entry made in books kept for that purpose, making a record of it from the time of its receipt until sold. The cotton was piled up in warehouses and "a tag put on the tier of cotton, with the number of bales and mark in that tier." The bills of lading, books, etc., were produced, all of which showed an intelligent and careful system of keeping a record of the cotton. All of the cotton was marked at Fremont "P. O. C.," and the

cotton sold had those letters on it. The bales, as shipped in lots, were marked in Fremont with the number in each lot and weight. The discrepancy found is in the marked number and weights. There is evidence tending to show that the marks on the bales, made with a brush dipped in a preparation made of lamp black, are rubbed off, or partially obliterated, in handling, shipping, etc., and that they are not regarded as of any importance in dealing with cotton, etc.

It is impossible to conceive any motive on the part of Vaughan & Barnes to mix the cotton with other lots; but, independent of that view, the evidence all shows a long and satisfactory course of dealing between the parties, the advancement of large sums of money, and shipment of large quantities of cotton. Peacock says that he had "extensive dealings" with them for more or less 18 years, and that "the accounts they rendered were always correct and satisfactory." It would not be just to any of the parties to pass upon and decide a charge so serious in its character upon the unsatisfactory evidence offered to sustain it in a summary proceeding. If the trustee wishes to prosecute it, as he is entitled to do, it is but fair that he should resort to the usual action, where such controversies may be tried before either a jury or such other tribunal as the law provides. For the purpose of this proceeding, the suggestion that the cotton sold April 28, 1909, was not the same cotton shipped by Peacock has not been established.

Vaughan & Barnes held at the date of the adjudication a number of collateral notes, mortgages, etc., the value of which was estimated by the trustees and a person representing the creditor at $2,943.88, and a real estate mortgage for $2,000. These amounts were deducted from the debt thus ascertaining the ultimate balance for which proof was made. No objections seem to be made to this valuation.

The last contention presented by the petition is that "$18,186 worth of cotton was shipped to Vaughan & Barnes by R. E. Peacock within four months next preceding the beginning of the proceedings in bankruptcy; that during said period of four months Vaughan & Barnes advanced to R. E. Peacock the sum of $14,794.24," etc. While this contention is not very clearly set out, it is based upon the theory that all sums received from the sale of cotton shipped within four months next preceding the filing of the petition in excess of the amount actually advanced on such cotton, and applied to the balance due on the account prior to the beginning of the four months, was a preference, and that the debt is not provable unless such sums are returned. The referee makes no finding of fact upon this contention. Conceding the truth of the condition of the account, as is done by Vaughan in his answer, there is no evidence, so far as my examination of the testimony discloses, that Peacock knew that he was insolvent, or that Vaughan had any such knowledge. I find no evidence that Peacock intended making any preference; on the contrary, the cotton was shipped in the regular course of business and drafts paid, in accordance with the contract made long before there was any thought of insolvency. Without quoting the language of sections 60 and 67e, defining voidable preference, it is clear that the shipment of cotton by Peacock from January to April, 1909, was not made with any purpose condemned by either of them, or that, if he did so, Vaughan "had rea-

sonable cause to believe that it was intended thereby to give a prefer-ence." It is only when the transaction comes within either of these sections that section 57g applies.

Peacock says that he thought that he was solvent a short time be-fore he made the assignment and thought so "then"; that a short time before the assignment he told Vaughan that he was worth $20,000 to $30,000. Vaughan says that he had "not the slightest idea that Pea-cock was insolvent up to the time of his assignment; that on his last visit to Norfolk, a short time before the assignment, Peacock stated that he was worth twenty odd thousand dollars more than his liabili-ties." His schedule shows nominal assets very largely in excess of his liabilities. The decided cases holding that payment made, or as in this case shipments of cotton, on running account under such condi-tions, do not constitute a preference, are numerous and uniform. Ja-quith v. Alden, 189 U. S. 78, 23 Sup. Ct. 649, 47 L. Ed. 717; Yaple v. Grocery Co., 193 U. S. 526, 24 Sup. Ct. 552, 48 L. Ed. 776; Wild v. Prov. Trust Co., 214 U. S. 292, 29 Sup. Ct. 619, 53 L. Ed. 1003. The Federal Reporter abounds with well-considered and uniform de-cisions to the same effect. In Hussey v. Richardson, 148 Fed. 598, at page 602, 78 C. C. A. 370, at page 375, it is said:

"The giving of a preference by an insolvent, as defined by section 60a, af-fords sufficient ground for adjudication of bankruptcy against him, but is not sufficient to avoid the transfer constituting a preference as against the person receiving it. To accomplish the latter it must be shown, additionally, that the one receiving it had reasonable cause to believe it was a preference."

See, also, the well-considered opinion of Judge McPherson in Re Armstrong (D. C.) 145 Fed. 202, in which the authorities are reviewed.

After a careful consideration of the record, evidence, and the full and helpful arguments, both oral and by brief, I am constrained to hold:

(1) That the referee exceeded his jurisdiction in rendering any af-firmative judgment against Vaughan & Barnes.

(2) That for any of the matters and things involved in the second, third, and fourth paragraphs of the trustee's petition he must institute a plenary suit in a court having jurisdiction.

(3) That for the purpose of expunging the proof of claim the conten-tions of the trustee cannot be sustained.

This will be certified to the referee, to the end that further pro-ceedings may be had in accordance with this opinion.